# DEPARTMENT OF THE ARMY *v.* BLUE FOX, INC.

No. 97-1642. Argued December 1, 1998.—Decided January 20, 1999.

*Jeffrey A. Lamken* argued the cause for petitioner. With him on the briefs were *Solicitor General Waxman, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler,* and *Barbara C. Biddle.*

*Thomas F. Spaulding* argued the cause for respondent. With him on the brief was *David A. Webster.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

An insolvent prime contractor failed to pay a subcontractor for work the latter completed on a construction project for the Department of the Army. The Department of the Army having required no Miller Act bond from the prime

*Briefs of *amici curiae* urging affirmance were filed for the American Subcontractors Association by *David R. Hendrick* and *Joel S. Rubinstein;* and for the Chamber of Commerce of the United States by *Herbert L. Fenster, Tami Lyn Azorsky,* and *Robin S. Conrad.*

*Edward G. Gallagher* filed a brief for the Surety Association of America as *amicus curiae.*

contractor, the subcontractor sought to collect directly from the Army by asserting an equitable lien on certain funds held by the Army. The Court of Appeals for the Ninth Circuit held that § 10(a) of the Administrative Procedure Act (APA), 5 U. S. C. § 702, waived the Government's immunity for the subcontractor's claim. We hold that § 702 did not nullify the long settled rule that sovereign immunity bars creditors from enforcing liens on Government property.

Participating in a business development program for socially and economically disadvantaged firms run by the Small Business Administration (SBA), the Department of the Army contracted with Verdan Technology, Inc., in September 1993, to install a telephone switching system at an Army depot in Umatilla, Oregon. Verdan, in turn, employed respondent Blue Fox, Inc., as a subcontractor on the project to construct a concrete block building to house the telephone system and to install certain safety and support systems.

Under the Miller Act, 40 U. S. C. §§ 270a–270d, a contractor that performs "construction, alteration, or repair of any public building or public work of the United States" generally must post two types of bonds. § 270a(a). First, the contractor must post a "performance bond . . . for the protection of the United States" against defaults by the contractor. § 270a(a)(1). Second, the contractor must post a "payment bond . . . for the protection of all persons supplying labor and material." § 270a(a)(2). The Miller Act gives the subcontractors and other suppliers "the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him." § 270b(a). Although the Army's original solicitation in this case required the contractor to furnish payment and performance bonds if the contract price exceeded $25,000, the Army later amended the solicitation, treated the contract as a "services contract," and deleted

the bond requirements. Verdan therefore did not post any Miller Act bonds.

Blue Fox performed its obligations, but Verdan failed to pay it the $46,586.14 that remained due on the subcontract. After receiving notices from Blue Fox that it had not been fully paid, the Army nonetheless disbursed a total of $86,132.33 to Verdan as payment for all work that Verdan had completed. In January 1995, the Army terminated its contract with Verdan for various defaults and another contractor completed the Umatilla project. Blue Fox obtained a default judgment in tribal court against Verdan. Seeing that it could not collect from Verdan or its officers, it sued the Army for the balance due on its contract with Verdan in Federal District Court.[1]

Predicating jurisdiction on 28 U. S. C. § 1331 and the APA, Blue Fox sought an "equitable lien" on any funds from the Verdan contract not paid to Verdan, or any funds available or appropriated for completion of the Umatilla project, and an order directing payment of those funds to it. Blue Fox also sought an injunction preventing the Army from paying any more money on the Verdan contract or on the follow-on contract until Blue Fox was paid. By the time of the suit, however, the Army had paid all amounts due on the Verdan contract, Blue Fox failed to obtain any preliminary relief, and the Army subsequently paid the replacement contractor the funds remaining on the Verdan contract plus additional funds.[2]

---

[1] Although Blue Fox also named the SBA as a defendant, the District Court granted summary judgment in the SBA's favor, the Court of Appeals affirmed that decision, and Blue Fox has not challenged that ruling.

[2] The Army paid the replacement contractor, in part, with the funds from the undisbursed balance on the Verdan contract (approximately $85,000) which had been designated for certain work that Verdan failed to complete. No funds due to Verdan for work actually performed had been held back or retained by the Army. The Army paid the replacement contractor in July 1995, two months after Blue Fox filed its action against the Army in the District Court.

On cross-motions for summary judgment, the District Court held that the waiver of sovereign immunity provided by the APA did not apply to respondent's claim against the Army. The District Court thus concluded that it did not have jurisdiction over respondent's claim and accordingly granted the Army's motion for summary judgment. In a split decision, the Court of Appeals for the Ninth Circuit reversed in relevant part. See *Blue Fox Inc.* v. *Small Business Admin.*, 121 F. 3d 1357 (1997). The majority held that under this Court's decision in *Bowen* v. *Massachusetts*, 487 U. S. 879 (1988), the APA waives immunity for equitable actions. Based in part on its analysis of several of our cases examining a surety's right of subrogation, the majority held that the APA had waived the Army's immunity from Blue Fox's suit to recover the amount withheld by the Army. The majority concluded that the lien attached to funds retained by the Army but owed to Verdan at the time the Army received Blue Fox's notice that Verdan had failed to pay. The majority stated that "[t]he Army cannot escape Blue Fox's equitable lien by wrongly paying out funds to the prime contractor when it had notice of Blue Fox's unpaid claims." 121 F. 3d, at 1363.

The dissenting judge stated that "no matter how you slice Blue Fox's claim, it seeks funds from the treasury to compensate for the Army's failure to require Verdan to post a bond." *Id.*, at 1364 (opinion of Rymer, J.). In her view, Congress chose to protect subcontractors like Blue Fox through the bond requirements of the Miller Act, not by waiving immunity in the APA to permit subcontractors to sue the United States directly for amounts owed to them by the prime contractor. Because this rule has been "conventional wisdom for at least fifty years," she did not agree that Congress had waived the Army's sovereign immunity from Blue Fox's suit. *Ibid.* The Government petitioned for review, and we granted certiorari to decide whether the APA has

waived the Government's immunity from suits to enforce an equitable lien.   524 U. S. 951 (1998).

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."   *FDIC* v. *Meyer*, 510 U. S. 471, 475 (1994).   Congress, of course, has waived its immunity for a wide range of suits, including those that seek traditional money damages.   Examples are the Federal Tort Claims Act, 28 U. S. C. § 2671 *et seq.*, and the Tucker Act, 28 U. S. C. § 1491.[3]   They are not involved here.   Respondent sued the Army under § 10(a) of the APA, which provides in relevant part:

> "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.   An action in a court of the United States seeking relief *other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."   5 U. S. C. § 702 (emphasis added).

Respondent asks us to hold, as did the court below, that this provision, which waives the Government's immunity from

---

[3] The Federal Tort Claims Act provides that, subject to certain exceptions, "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances."   28 U. S. C. § 2674.   The Tucker Act grants the Court of Claims jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."   28 U. S. C. § 1491(a)(1).   The Tucker Act also gives federal district courts concurrent jurisdiction over claims founded upon the same substantive grounds for relief but not exceeding $10,000 in damages.   See § 1346(a)(2).

actions seeking relief "other than money damages," allows subcontractors to place liens on funds held by the United States Government for work completed on a prime contract. We have frequently held, however, that a waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign. See, e. g., Lane v. Peña, 518 U. S. 187, 192 (1996) (citing cases); Library of Congress v. Shaw, 478 U. S. 310, 318 (1986). Such a waiver must also be "unequivocally expressed" in the statutory text. See Lane, supra, at 192. Respondent's claim must therefore meet this high standard.

Respondent argues, and the court below held, that our analysis of § 702 in Bowen compels the allowance of respondent's lien. We disagree. In Bowen, we examined the text and legislative history of § 702 to determine whether the Commonwealth of Massachusetts could sue the Secretary of Health and Human Services to enforce a provision of the Medicaid Act that required the payment of certain amounts to the State for Medicaid services. We held that the State's complaint in Bowen was not barred by the APA's prohibition on suits for money damages. The Court of Appeals below read our decision in Bowen as interpreting § 702's reference to "other than money damages" as waiving immunity from all actions that are equitable in nature. See 121 F. 3d, at 1361 ("Since the APA waives immunity for equitable actions, the district court had jurisdiction under the APA").

Bowen's analysis of § 702, however, did not turn on distinctions between "equitable" actions and other actions, nor could such a distinction have driven the Court's analysis in light of § 702's language. As Bowen recognized, the crucial question under § 702 is not whether a particular claim for relief is "equitable" (a term found nowhere in § 702), but rather what Congress meant by "other than money damages" (the precise terms of § 702). Bowen held that Congress employed this language to distinguish between specific relief and compensatory, or substitute, relief. The Court stated:

" 'We begin with the ordinary meaning of the words Congress employed. The term "money damages," 5 U. S. C. § 702, we think, normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." ' " 487 U. S., at 895 (quoting *Maryland Dept. of Human Resources v. Department of Health and Human Services*, 763 F. 2d 1441, 1446 (CADC 1985) (citation omitted)).

*Bowen* also concluded from its analysis of relevant legislative history that "the drafters had in mind the time-honored distinction between damages and specific relief." 487 U. S., at 897. *Bowen*'s interpretation of § 702 thus hinged on the distinction between specific relief and substitute relief, not between equitable and nonequitable categories of remedies.

We accordingly applied this interpretation of § 702 to the State's suit to overturn a decision by the Secretary disallowing reimbursement under the Medicaid Act. We held that the State's suit was not one "seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it [was] a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Id.*, at 900. The Court therefore concluded that the substance of the State's suit was one for specific relief, not money damages, and hence the suit fell within § 702's waiver of immunity.

It is clear from *Bowen* that the equitable nature of the lien sought by respondent here does not mean that its ultimate claim was not one for "money damages" within the meaning of § 702. Liens, whether equitable or legal, are merely a means to the end of satisfying a claim for the recovery of money. Indeed, equitable liens by their nature constitute substitute or compensatory relief rather than specific relief. An equitable lien does not "give the plaintiff the very thing

to which he was entitled," *id.*, at 895 (citations and internal quotation marks omitted); instead, it merely grants a plaintiff "a security interest in the property, which [the plaintiff] can then use to satisfy a money claim," usually a claim for unjust enrichment, 1 D. Dobbs, Law of Remedies § 4.3(3), p. 601 (2d ed. 1993); see also Laycock, The Scope and Significance of Restitution, 67 Texas L. Rev. 1277, 1290 (1989) ("The equitable lien is a hybrid, granting a money judgment and securing its collection with a lien on the specific thing"). Commentators have warned not to view equitable liens as anything more than substitute relief:

> "[T]he *form* of the remedy requires that [a] lien or charge should be established, and then enforced, and the amount due obtained by a sale total or partial of the fund, or by a sequestration of its rents, profits, and proceeds. These preliminary steps may, on a casual view, be misleading as to the nature of the remedy, and may cause it to appear to be something more than compensatory; but a closer view shows that all these steps are merely auxiliary, and that the *real* remedy, the final object of the proceeding, is the pecuniary recovery."
> 1 J. Pomeroy, Equity Jurisprudence § 112, p. 148 (5th ed. 1941).

See also Dobbs, *supra*, at 601 (equitable lien foreclosure "results in only a monetary payment to the plaintiff and obviously does not carry with it the advantages of recovering specific property").

We accordingly hold that the sort of equitable lien sought by respondent here constitutes a claim for "money damages"; its goal is to seize or attach money in the hands of the Government as compensation for the loss resulting from the default of the prime contractor. As a form of substitute and not specific relief, respondent's action to enforce an equitable lien falls outside of § 702's waiver of sovereign immunity.

Our holding today is in accord with our precedent establishing that sovereign immunity bars creditors from attaching or garnishing funds in the Treasury, see *Buchanan* v. *Alexander*, 4 How. 20 (1845), or enforcing liens against property owned by the United States, see *United States* v. *Ansonia Brass & Copper Co.*, 218 U. S. 452, 471 (1910); *United States ex rel. Hill* v. *American Surety Co. of N. Y.*, 200 U. S. 197, 203 (1906) ("As against the United States, no lien can be provided upon its public buildings or grounds"). Respondent points to nothing in the text or history of § 702 that suggests that Congress intended to overrule this precedent, let alone anything that " 'unequivocally express[es]' " such an intent. *Lane*, 518 U. S., at 192.

Instead, recognizing that sovereign immunity left subcontractors and suppliers without a remedy against the Government when the general contractor became insolvent, Congress enacted the Miller Act (and its predecessor the Heard Act) to protect these workers. See *United States* v. *Munsey Trust Co.*, 332 U. S. 234, 241 (1947); *Ansonia Brass & Copper Co., supra*, at 471. But the Miller Act by its terms only gives subcontractors the right to sue on the surety bond posted by the prime contractor, not the right to recover their losses directly from the Government.

Respondent contends that in several cases examining a surety's right of equitable subrogation, this Court suggested that subcontractors and suppliers can seek compensation directly against the Government. See, *e. g., Prairie State Bank* v. *United States*, 164 U. S. 227 (1896); *Henningsen* v. *United States Fidelity & Guaranty Co. of Baltimore*, 208 U. S. 404, 410 (1908); *Pearlman* v. *Reliance Ins. Co.*, 371 U. S. 132, 141 (1962) (stating that "the laborers and materialmen had a right to be paid out of the fund [retained by the Government]" and hence a surety was subrogated to this right); but see *Munsey Trust Co., supra*, at 241 ("[N]othing is more clear than that laborers and materialmen do not have enforceable rights against the United States for their com-

pensation"). None of the cases relied upon by respondent involved a question of sovereign immunity, and, in fact, none involved a subcontractor directly asserting a claim against the Government. Instead, these cases dealt with disputes between private parties over priority to funds which had been transferred out of the Treasury and as to which the Government had disclaimed any ownership. They do not in any way disturb the established rule that, unless waived by Congress, sovereign immunity bars subcontractors and other creditors from enforcing liens on Government property or funds to recoup their losses.

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*