Stephen M. FLATOW, Plaintiff,

v.

THE ISLAMIC REPUBLIC OF IRAN, the Iranian Ministry of Information & Security, Ayatollah Ali Hoseinie Khamenei, Ali Akbar Hashemi–Rafsanjani, Ali Fallahian–Khuzestani, and John Does 1–99, Defendants.

No. 97–396 (RCL).

United States District Court, District of Columbia.

Nov. 15, 1999.

Steven R. Perles, Washington, DC, Thomas Fortune Fay, Washington, DC, for Plaintiff.

Philip D. Bartz, Deputy Asst. Atty. General, David W. Ogden, Wilma Lewis, Frank W. Hunger, Vincent M. Garvey, Sanjay Bhambani, Carol Federighi, David J. Anderson, Andrea G. Cohen, U.S. Dept. of Justice, Civil Division, Washington, DC, for Defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

The United States moves to quash the writ of attachment entered by the Clerk of this Court on November 18, 1998, which purports to attach "all credits held by the United States to the benefit of the Islamic Republic of Iran," including U.S. Treasury funds owed to Iran in accordance with an award of the Iran–United States Claims Tribunal, Seeking these funds to satisfy part of his prior judgment against Iran, Plaintiff Stephen Flatow maintains that certain amendments to the Foreign Sovereign Immunities Act waive the United States' sovereign immunity with respect to .U.S. funds owed to judgment debtors. 28 U.S.C. § 1610(f)(1)(A) & § 1610(a)(7) (Supp.1999). Because this Court finds that Congress has not clearly and unequivocally waived the United States' sovereign immunity, the Court GRANTS the United States's Motion to Quash the Writ of Attachment. This order, however, is stayed, for ten days, to provide plaintiff the opportunity to seek a further stay from the Court of Appeals.

## I. Factual and Procedural Background

In April 1995, Alisa Flatow, Plaintiff Stephen Flatow's 20–year–old daughter, was killed in a terrorist bombing of a tourist bus in Israel. The terrorist group responsible for the suicide bombing mission, the Shaqaqi faction of the Palestine Islamic Jihad, is funded exclusively by the Islamic Republic of Iran ("Iran"). *See Flatow v. The Islamic Republic of Iran,* 999 F.Supp. 1, 6–9 (D.D.C.1998).

A year after Alisa Flatow's murder, Congress amended the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 (1994 & Supp.1999) ("FSIA"), by enacting the Antiterrorism and Effective Death Penalty Act of 1996, which lifts the sovereign immunity of foreign states that commit acts of terrorism or provide material support for terrorism. Pub.I., No. 104–132, Title II, § 221(a), (April 24, 1996), 110 Stat. 1241, *codified at* 28 U.S.C. § 1605 (1996 & Supp.1999 ). In addition, Congress created a federal cause of action for personal injury or death and provided, *inter*

*alia,* that punitive damages would be available in actions brought under the state-sponsored terrorism exception. 28 U.S.C. § 1605(a)(7) (1996 & Supp.1999). This particular amendment became known as the "Flatow Amendment." *Flatow,* 999 F.Supp. at 12.

Pursuant to these newly enacted provisions, Flatow filed a wrongful death action against Iran, its Ministry of Information & Security, and various government officials. *See Flatow,* 999 F.Supp. at 8–10. Iran failed to appear. Accordingly, after an evidentiary hearing in which the plaintiff "establishe[d] his claim or right to relief by evidence ... satisfactory to the Court," 28 U.S.C. § 1608(e), this Court entered a default judgment against Iran, finding Iran and its codefendants jointly and severally liable for loss of accretions, compensatory damages, solatium and $225,000,000.00 in punitive damages. *See Flatow,* 999 F.Supp. at 5.

Attempting to execute this judgment, plaintiff filed a writ of attachment on November 18, 1998 against certain U.S. Treasury funds owed to Iran. Specifically, plaintiff sought attachment of $5,042,481.65 plus interest in the Treasury Judgment Fund, which was awarded to Iran by the Iran–U.S. Claims Tribunal ("Tribunal"). *See Islamic Republic of Iran v. United States,* Case No. A/27, AWD No. 586–A27–FT, (Iran–United States Claims Tribunal June 5, 1998).

In opposing the United States' motion to quash the writ of attachment, plaintiff contends that these U.S. Treasury funds, which are earmarked for payment of the Tribunal award, represent the property of Iran. *See* Iranian Assets Control Regulations, 31 C.F.R. § 535.311(1999) (recognizing, *inter alia.* debt, indebtedness and judgments as property). As such, plaintiff maintains that these funds are subject to attachment pursuant to the Foreign Sovereign Immunities Act. 28 U.S.C. § 1610(f)(1)(A) & (a)(1)(7) (1998). More specifically, he claims that because he is a judgment-creditor of Iran, he is entitled to

these funds as partial satisfaction of his March 11, 1998 judgment.

Needless to say, the United States does not share plaintiff's characterization of these U.S. Treasury funds as "Iranian property." Rather, the United States maintains that attachment of the funds constitutes a suit against the United States, which is barred by the doctrine of sovereign immunity. *Buchanan v. Alexander,* 45 U.S. (4 How.) 20, 21, 11 L.Ed. 857 (1846).

As a preliminary matter, then, this Court must determine whether the funds at issue constitute property of the United States or Iran. As explained below, controlling authority dictates the finding that the Treasury funds are U.S. property. As such, sovereign immunity bars their attachment here, as neither the Iranian Assets Control Regulations nor the Foreign Sovereign Immunities Act contain a clear and unequivocal waiver of the United States' immunity.

## II. Sovereign Immunity

Suits against the United States are barred by sovereign immunity, absent an effective waiver. *Department of Army v. Blue Fox, Inc.,* 525 U.S. 255, 119 S.Ct. 687, 690, 142 L.Ed.2d 718 (1999)(holding that sovereign immunity barred subcontractor's equitable lien against United States); *FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (finding that "sue-and-be-sued" clause waived government agency's sovereign immunity); *see also United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."). Waiver of the federal government's sovereign immunity must be "expressed in unequivocal statutory text and cannot be implied." *Blue Fox,* 119 S.Ct. at 690; *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) ("A waiver of the

Federal Government's sovereign immunity must be unequivocally expressed in statutory text."); *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992) ("Waivers of the Government's sovereign immunity, to be effective, must be 'unequivocally expressed.' ")(quoting *Mitchell*, 463 U.S. at 206, 103 S.Ct. 2961). Moreover, courts must construe the scope of such waivers "strictly in favor of the sovereign." *Blue Fox*, 119 S.Ct. at 691; *Lane*, 518 U.S. at 192, 116 S.Ct. 2092; *Nordic Village*, 503 U.S. at 33, 112 S.Ct. 1011. Accordingly, any ambiguities in the statutory text must be resolved in favor of immunity. *United States v. Williams*, 514 U.S. 527, 531, 115 S.Ct. 1611, 131 L.Ed.2d 608 (1995). In sum, these rules of construction derive from the fact that sovereign immunity operates as a jurisdictional bar. As such, "the 'terms of [the United States'] consent to be sued in any court define [a] court's jurisdiction to entertain the suit.' " *Meyer*, 510 U.S. at 475, 114 S.Ct. 996 (quoting *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)).

▋ Principles of sovereign immunity apply with equal force to attachments and garnishments. *See Buchanan v. Alexander*, 45 U.S. (4 How.) 20, 21, 11 L.Ed. 857 (1846); *FHA v. Burr*, 309 U.S. 242, 243, 60 S.Ct. 488, 84 L.Ed. 724 (1940); *see also Neukirchen v. Wood County Head Start, Inc.*, 53 F.3d 809, 811 (7th Cir.1995); *Automatic Sprinkler Corp. v. Darla Envtl. Specialists*, 53 F.3d 181, 182 (7th Cir.1995); *State of Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C.Cir.1991); *Haskins Bros. & Co. v. Morgenthau*, 85 F.2d 677, 681 (App.D.C. 1936). Indeed, early Supreme Court precedent established that creditors may not attach funds held by the U.S. Treasury or its agents. *Buchanan*, 45 U.S. at 21, 45 U.S. 20. As the Supreme Court explained, "[s]o long as money remains in the hands of a disbursing officer, it is as much the money of the United States, as if it had not been drawn from the treasury." *Id.* In other words, funds held in the U.S. Trea-

sury—even though set aside or "earmarked" for a specific purpose—remain the property of the United States until the government elects to pay them to whom they are owed. *Id.* ("Until paid over by the agent of the government to the person entitled to it, the fund cannot, in any legal sense, be considered a part of his effects."). Notably, the Supreme Court has recently reaffirmed the continued vitality of this precedent. *See Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 119 S.Ct. 687, 692, 142 L.Ed.2d 718 (1999) (Rehnquist, C.J.) (citing *Buchanan*). In holding that a subcontractor's lien against government funds owed to an insolvent prime contractor was barred by sovereign immunity, the Supreme Court stated that such a result "is in accord with our precedent establishing that sovereign immunity bars creditors from attaching or garnishing funds in the Treasury." *Id.*

Similarly, the D.C. Circuit continues to acknowledge the principle set forth in *Buchanan*. *See State of Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C.Cir.1991) (citing *Buchanan* ). While rejecting states' claims against money owed to their citizens by the federal government, the D.C. Circuit stated that "[w]hen the United States sets aside money for the payment of specific debts, it does not thereby lose its property interest in that money." *Id.* To the contrary, the court of appeals determined that "[t]he money here is federal money. That various persons have claims against the United States in amounts exactly matching the funds, and intended by Congress to be paid from these funds, does not give those individuals a property interest in the money." *Id.* at 334.

Even early precedent from this circuit recognized this principle. *Haskins Bros. v. Morgenthau*, 85 F.2d 677, 681 (App.D.C. 1936). In *Haskins*, the court of appeals rejected a corporation's claim for recovery of taxes assessed on imported coconut oil, determining that it was "of no consequence that the bill alleges that the fund belongs to appellant and others similarly situated."

Rather, the court concluded that "it is money in the Treasury of the United States as to which the United States had and have the power of control and disposition." *Id.*

Likewise, other courts, following *Buchanan*, have rejected claims against funds held in the U.S. Treasury. For example, in rejecting a suit against the United States brought by a judgment-creditor of a defunct government contractor, the Seventh Circuit stated that "the principle of governmental immunity is simple: anyone who seeks money from the Treasury needs a statute authorizing that relief." *Automatic Sprinkler Corp. v. Darla Envtl. Specialists*, 53 F.3d 181, 182 (7th Cir.1995). And, in *Neukirchen v. Wood County Head Start*, the Seventh Circuit reversed a district court's issuance of a writ of execution against property purchased by federal grant funds, stating that "[i]t is axiomatic that the doctrine of sovereign immunity prevents a judgment creditor from attaching federal property, absent consent by the United States." 53 F.3d 809, 811 (7th Cir.1995) (citing *Buchanan*); *see also Palmiter v. Action, Inc.*, 733 F.2d 1244, 1248 (7th Cir.1984) (holding that a judgment creditor could not garnish federal funds granted to a state program); *Henry v. First Nat. Bank of Clarksdale*, 595 F.2d 291, 309 (5th Cir.1979) (determining that sovereign immunity protects federal grant funds from garnishment).

Here, it is undisputed that the funds plaintiff seeks to attach are held in the U.S. Treasury. Moreover, plaintiff has pointed to no contrary authority that undermines the continued strength of *Buchanan* and its progeny. Thus, controlling authority requires this Court to find that the Treasury funds at issue here are U.S. property and that the writ of attachment constitutes a suit against the United States, which is barred by sovereign immunity. *Blue Fox*, 119 S.Ct. at 690. Accordingly, the Court must grant the United States' motion to quash, unless plaintiff can identify an explicit, unequivocal waiver of the United States' sovereign immunity with respect to these funds. As explained below, however, plaintiff's endeavors in this regard will prove to be unsuccessful.

### III. The Foreign Sovereign Immunities Act

■ Notwithstanding the authority supporting the United States' contention that sovereign immunity bars attachment of funds held in the U.S. Treasury, plaintiff maintains that this doctrine is inapplicable because these funds are not U.S. property. To the contrary, plaintiff asserts that the Tribunal judgment constitutes Iranian property, as defined by the Iranian Assets Control Regulations. 31 C.F.R. § 535.311 (1999). Thus, according to plaintiff, as Iranian property, these funds are subject to attachment pursuant to two amendments to the Foreign Sovereign Immunities Act. *See* 28 U.S.C.A. § 1610(a)(7) (providing that property in the United States of a foreign state used for a commercial activity is subject to attachment to satisfy Section 1605(a)(7) judgments); 28 U.S.C.A. § 1610(f)(1)(A) (providing that judgments obtained pursuant to 28 U.S.C. § 1605(a)(7) may be satisfied by attachment of property subject to the Iranian Assets Control Regulations). But, as explained below, plaintiff's argument must fail, as he cannot identify a waiver of sovereign immunity that unequivocally and expressly authorizes the attachment and payment of U.S. Treasury funds owed to Iran to third-party judgment-creditors.[1]

---

1. Plaintiff also advances that the President's waiver of the requirements of Section 1610(f) of the Foreign Sovereign Immunities Act exceeds the scope of the waiver authority that was delegated by Congress. *See* Waiver of Exception to Immunity from Attachment or Execution, Pub.L. 105–277, Title I, § 117(d),

112 Stat. 2681 (October 21, 1998) (stating that "[t]he President may waive the requirements of this section... in the interest of national security"); *see also* Determination to Waive Requirements Relating to Blocked Property of Terrorist–List States, 63 Fed.Reg. 59201 (October 21, 1998) (exercising authori-

Plaintiff's argument that the Foreign Sovereign Immunities Act authorizes attachment of these Treasury funds proceeds from the legally untenable assertion that such funds constitute Iranian property under the Iranian Assets Control Regulations. These regulations define property to

"include, *but not by way of limitation,* money, checks, drafts, bullion, bank deposits, savings accounts, *debts, indebtedness,* ... any other evidences of title, ownership or indebtedness, ... *judgments,* ... and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future or contingent."

*Id.* (emphasis added). Admittedly, by its plain terms, this definition appears to cover any debt or judgment held by Iran, irrespective of the identity of the debtor. Nevertheless, this Court need not decide whether this seemingly expansive definition of property covers a judgment against the United States held in the U.S. Treasury, for two reasons. First, to obtain money from the U.S. treasury, there must be a *statute* authorizing payment. *See Automatic Sprinkler,* 53 F.3d at 182 (citing, *inter alia, Nordic Village,* 503 U.S. at 33–34, 112 S.Ct. 1011). Here, plaintiff points to a definition contained in a Treasury *regulation.* Second, and more important, plaintiff's characterization of the Treasury funds as Iranian property is refuted by the weight of authority, *see su-*

*pra,* which is binding on this Court. Moreover, even assuming *arguendo* that the regulation's definition of property does cover debts or judgments against the United States, plaintiff still could not prevail with his claim, as neither the Iranian Assets Control Regulations [2] nor the Foreign Sovereign Immunities Act contain the sort of express and unequivocal waiver required to abrogate the United States' sovereign immunity. *See Blue Fox,* 119 S.Ct. at 690 (instructing that "[w]aiver of the federal government's sovereign immunity must be expressed in unequivocal statutory text and cannot be implied").

### A. Section 1610(f)(1)(A)

Proceeding from the unsupported assertion that the Tribunal judgment represents Iranian property, plaintiff argues that Congress intended to abrogate the United States' sovereign immunity for purposes of enforcing judgments obtained under the Foreign Sovereign Immunities Act. To support this position, plaintiff points to the plain language of Section 1610(f)(1)(A) and the canon of statutory construction, *expresio unius est exclusio alterius.* To wit, Section 1610(f)(1) provides that

*Notwithstanding any other provision of law,* including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. § 4308(f)), and except as provided in subparagraph (B), *any property with respect to which financial transactions are* prohibited or *regulated pursuant to* section 5(b) of the Trading with

ty to waive requirements under § 117(d) and stating that such requirements "would impede the ability of the President to conduct foreign policy in the interest of national security"). Because the Court finds that the FSIA provisions at issue fail to set forth an effective waiver of U.S. sovereign immunity, and thus are not applicable to funds in the U.S. Treasury, the Court need not address the proper scope of the President's waiver authority under Section 117(d). *See* Pub.L. No. 105–277, § 101(h) [Title I, § 117], 112 Stat. 2681, 2681–491 (1998).

2. As noted above, the broad definition of property in these regulations makes no specific mention of judgments or debts owed by the

United States and held in the Treasury. Indeed, because the regulation is directed at financial institutions, such as private banks, it is questionable whether the regulation even applies to the U.S. Treasury. *See, e.g.,* 31 C.F.R. § 500.308 (defining "person"); 31 C.F.R. § 500.314 (defining "banking institution"); 31 C.F.R. § 500.320 (defining "domestic bank"). Irrespective of its scope, however, none of regulation's provisions expressly authorizes the Secretary of the Treasury to waive the United States' sovereign immunity with respect to the Treasury's Judgment Fund. Nor does any unequivocal expression a waiver of sovereign immunity appear anywhere in the regulations.

the Enemy Act (50 U.S.C. § 5(b)), section 620(a) of the Foreign Assistance Act of 1961(22 U.S.C. § 2370(a)), *sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701–1702)*, or any other proclamation, order, regulation, or license issued pursuant thereto, *shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under section 1605(a)(7).*

28 U.S.C. § 1610(f)(1)(A)(emphasis added). Plaintiff posits that the opening clause, "[n]otwithstanding any provision of law," encompasses any sovereign interest of the United States in the Tribunal judgment that exists either by statute or at common law. In addition, plaintiff contends that the one enumerated exception, which applies to property held by or in trust for a natural person, as evidence of Congress' intent that the provision be applicable in all other instances, including attachments of U.S. Treasury funds. 28 U.S.C. § 1610(f)(1)(B). In short, plaintiff reasons that because Congress chose to enumerate one exception to this provision, had Congress intended to create other exceptions, such as retaining the sovereign immunity of U.S. Treasury funds, it would have done so explicitly.

The Court begins by noting the seeming contradiction implicit in plaintiff's argument—*i.e.*, that in a statute purporting to abrogate the sovereign immunity of *foreign* states, Congress would waive the United States' sovereign immunity. But irony or unintended consequence aside, this Court finds that this provision fails to meet the exacting standard for finding an effective waiver of sovereign immunity. *See Lane*, 518 U.S. at 192, 116 S.Ct. 2092 (stating that "waivers of immunity must construed strictly in favor of the sovereign… and not enlarge[d] …beyond what the language requires") (citations omitted). First, plaintiff's assertions re-

garding the opening phrase, "notwithstanding any other provision of law," are unpersuasive. Construing, as it must, the scope and ambiguities in favor of the sovereign, *Williams*, 514 U.S. at 531, 115 S.Ct. 1611, the Court finds that the language "provision of law" is sufficiently imprecise so that it could be construed to refer only to other statutes, and not the common law doctrine of sovereign immunity. *Nordic Village*, 503 U.S. at 34, 112 S.Ct. 1011. This narrow interpretation of the opening clause is further supported by reference to the phrase immediately following it, which enumerates various statutes to which the provision applies.

Alternatively, even if the Court were to accept the plaintiff's broad reading of the opening phrase as encompassing the doctrine of sovereign immunity, such a waiver hardly rises to the requisite unequivocal expression mandated by the Supreme Court. *See Blue Fox*, 119 S.Ct. at 691; *Lane*, 518 U.S. at 192, 116 S.Ct. 2092; *Nordic Village*, 503 U.S. at 33, 112 S.Ct. 1011. Simply put, there is no language whatsoever suggesting that United States waives its immunity from attachment suits filed by third party creditors of Iran. Accordingly, as Congress is presumed to be familiar with the unequivocal expression requirement for waivers of sovereign immunity, *see United States Dep't of Energy v. Ohio*, 503 U.S. 607, 614, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992), the Court must conclude that no such waiver was contemplated here.

### B. Section 1610(a)(7)

Alternatively, plaintiff asserts that, even if the Court determines that Section 1610(f)(1)(A) does not apply in this matter, Section 1610(a)(7) authorizes the writ of attachment. Section 1610(a)(7), enacted as part of the Antiterrorism and Effective Death Penalty Act of 1996, provides that

*[t]he property in the United States of a foreign state*, as defined in section 1603(a) of this chapter, **used for commercial activity in the United States,**

shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, *if...*

> *(7)the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7),* regardless of whether the property is or was involved with the act upon which the claim is based.

28 U.S.C. § 1610(a)(7) (emphasis added). Essentially, plaintiff argues that this provision applies to the Treasury funds because the underlying basis for the Tribunal award was a contract dispute over sales of aircraft equipment between various entities controlled by the Iranian government and Avco Corporation, a U.S. corporation. *See Avco Corporation v. Iran Aircraft Indus.,* Award No. 377–261–3, at ¶ 145, *reprinted in* 19 Iran–U.S.C.T.R. 200, 230 (Iran–United States Claims Tribunal July 18, 1988). Hence, according to plaintiff, the "used for commercial activity" requirement is satisfied. But, as explained above, funds in the U.S. Treasury are not properly characterized as the "the property of a foreign state." Moreover, even assuming that the Treasury funds at issue satisfy this "commercial activity" requirement, the Court nonetheless finds that the statutory text lacks a clear, unequivocal waiver of immunity. Indeed, plaintiff points to nothing in the provision's language that is even remotely suggestive of congressional intent to waive the United States' sovereign immunity.

As a corollary to his argument under Section 1610(a)(7), plaintiff contends that he may attach these Treasury funds by virtue of the Algiers Accords.[3] Specifically, plaintiff notes that Iran and the United States both waived their sovereign immunity with respect to the enforcement of Tribunal awards, by agreeing that "[a]ny award which the Tribunal may render against either government shall be enforceable against such government in the courts of any nation in accordance with its laws." Algiers Accords, Art. IV(1)(3). Plaintiff reasons that because he is a judgment-creditor of Iran, he "stands in the shoes" of Iran vis à vis the United States. In short, citing *Harris v. Balk,* 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905) for the proposition that a creditor may obtain satisfaction on a debt from a third-party debtor of his debtor, plaintiff asserts that he is entitled to benefit from the United States' waiver of sovereign immunity in the Algiers Accords. Without deciding the extent to which, if any, the United States has waived its sovereign immunity with respect to Iran under the Algiers Accords, this Court is unpersuaded by this argument. First, *Harris v. Balk* did not address claims made against the United States, nor any other sovereign entity; hence it does nothing to alter the standards that apply to waivers of federal sovereign immunity. Moreover, applying the standards outlined by the Supreme Court, this Court does not find that the Algiers Accords contain an express waiver of sovereign immunity that would permit a third-party to attach U.S. funds owed to Iran. While plaintiff's assertion that Iran may seek to execute this judgment in any court may be correct, the Accords do not authorize third party creditors to enforce judgments for Iran. Absent a clear and unequivocal statement of consent to such a suit, this Court declines to imply one. *Meyer,* 510 U.S. at 475, 114 S.Ct. 996.

## IV. Conclusion

The Court concludes by acknowledging the apparent unfairness that attends its grant of the United States' motion to quash. Indeed, the Court regrets that its ruling today forestalls plaintiff's efforts to

---

**3.** *See* Art. IV.(1)(3), Decl. of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of Iran (19 January 1998), *reprinted in* U.S. Department of State, Selected Documents No. 19: Hostage Agreements Transmitted to Congress (March 12, 1981) ("Algiers Accords").

execute a judgment that was issued by this Court. *Flatow,* 999 F.Supp. at 5. Moreover, the Court appreciates plaintiff's frustration with the White House's present efforts to block his recovery, *see* Stephen M. Flatow, *In This Case, I Can't Be Diplomatic,* The Washington Post, November 7, 1999, at B2, particularly in light its previous pledges of support.[4] Nonetheless, this Court must remain faithful to its proper role within our constitutional system, which requires courts to follow the rule of law, not their own individual conceptions of what is fair or just. Accordingly, for the foregoing reasons, the United States' Motion to Quash the Writ of Attachment is GRANTED.

A separate order shall issue this date.

### ORDER

Upon consideration of the United States' Motion to Quash the November 18, 1998, Writ of Attachment for the funds held in the U.S. Treasury, the responses thereto, and for the reasons set forth in the accompanying memorandum opinion issued this date, it is hereby

ORDERED that the United States' Motion to Quash is GRANTED and the Writ of Attachment is hereby Quashed; and

it is further

ORDERED that this order is STAYED for Ten (10) Days to provide plaintiff the opportunity to seek a further stay from the Court of Appeals.

SO ORDERED.

---

4. *See, e.g.,* MEET THE PRESS (NBC Television Broadcast, November 7, 1999)(Interview with White House Chief of Staff John Podesta) (re-broadcasting February 26, 1996 videotape of President Clinton, where he stated "I am asking that Congress pass legislation that will provide immediate compensation to the families, something to which they are entitled under international law, out of Cuba's blocked assets here in the United States. If Congress passes this legislation, we can provide ·the compensation immediately."); *see* *also* President's Remarks on Signing the Antiterrorism and Effective Death Penalty Act of 1996, 32 WEEKLY COMP. PRES. DOC. 717 (April 24, 1996) (commenting that "[t]his bill strikes a mighty blow against terrorism, and it is fitting that this bill becomes law during National Crime Victim's Rights Week, because it stands up for victims in so many important ways" and concluding that "America will never abide terrorists... [w]e will not rest until we have brought them all to justice").