United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 22, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

————————

No. 04-20301

————————

WALKER INTERNATIONAL HOLDINGS LIMITED,

Plaintiff - Appellant,

versus

THE REPUBLIC OF CONGO; CAISSE CONGOLAISE
D'AMORTISSEMENT

Defendants - Appellees,

and

MURPHY EXPLORATION & PRODUCTION COMPANY
INTERNATIONAL

Garnishee - Appellee.

Appeals from the United States District Court
For the Southern District of Texas

Before SMITH and GARZA, Circuit Judges, and VANCE[*], District Judge.

EMILIO M. GARZA, Circuit Judge:

————————

[*]District Judge of the Eastern District of Louisiana, sitting by designation.

The Republic of Congo ("ROC") refuses to pay a judgment it owes Walker International Holdings Limited ("Walker"). In an effort to collect its judgment, Walker filed a garnishment action against Murphy Exploration & Production, International ("Murphy"), which owed the ROC money. Walker appeals the district court's decision dismissing the action and vacating a temporary restraining order ("TRO") and writs of attachment and garnishment. We previously ordered a stay of the district court's order pending this appeal. Walker claims that under the Foreign Sovereign Immunities Act ("FSIA"), the property is attachable because it is "used for a commercial activity in the United States." We find that the district court correctly vacated the TRO, dissolved the writs of attachment and garnishment, and dismissed the action.

I

The ROC and Sadelmi Cogepi SpA ("Sadelmi"), an Italian company, entered into a contract for the construction of electric infrastructure in the ROC. Sadelmi completed the construction and the ROC defaulted on its payments. Walker purchased the debt from Sadelmi in an assignment agreement. Under the terms of the contract between Sadelmi and the ROC, Walker brought an arbitration proceeding before the International Chamber of Commerce ("ICC") in Paris, France. The ICC found that the ROC was liable to Walker. After French courts upheld the award, Walker registered the $26,093,251 award in the United States District Court for the District of Columbia.

Walker then filed a garnishment action in the Southern District of Texas against Murphy to obtain signing bonuses and other payments that Walker suspected Murphy owed the ROC and its national oil company, Societe Nationale des Petroles du Congo ("SNPC"). In addition, Walker filed a motion for a TRO to prevent Murphy from making any payments to the ROC or SNPC. Murphy filed motions to vacate the TRO, to dissolve writs of attachment and garnishment, and to dismiss.

2

The magistrate judge granted these motions on the basis that the property was not "used for commercial activity" under the FSIA. Walker appealed, and this court upheld a stay pending appeal. Murphy paid the ROC its signing bonus payment and placed the equivalent, $6,360,000, into a surety bond which requires payment to Walker on "any final, non-appealable judgment that Walker . . . obtains in [this] garnishment action. . . ."

## II

The parties first contend that three arguments determine the controversy *without* FSIA analysis. We find that these arguments lack merit. First, Murphy asserted in oral argument that the writ of garnishment was filed prematurely and, hence, there was nothing to attach. Murphy failed to brief this argument. Therefore, the argument is deemed waived. *United States v. Thames*, 214 F.3d 608, 612 n.3 (5th Cir. 2000).

Second, Walker argues that it is entitled to the surety bond because it is not the property of the ROC and, hence, the FSIA is inapplicable. Walker cites *Flatow v. Islamic Republic of Iran*, 74 F.Supp.2d 18 (D.D.C. 1999), which ruled that property held by the United States as an award to Iran was property of the United States, and therefore not subject to attachment under the FSIA. In *Flatow*, the plaintiff sought to garnish U.S. Treasury funds earmarked for payment of Iran-United States Claims Tribunal awards. The court denied garnishment because "creditors may not attach funds held by the U.S. Treasury or its agents." *Id.* at 21. The court reasoned, "In other words, funds held in the U.S. Treasury )) even though set aside or 'earmarked' for a specific purpose )) remain the property of the United States until the government elects to pay them to whom they are owed." *Id.* Here, Liberty Mutual Insurance Company, a private corporation which does not enjoy sovereign immunity, holds the surety bond. Therefore, the *Flatow* analysis is inapplicable.

3

Third, Walker claims that the bond requires payment to Walker on "any final, non-appealable judgment that Walker International Holdings Limited obtains in the garnishment action styled *Walker International Holdings Limited v. The Republic of Congo*, *et al.*, Civil Action No. 03-CV-3497 (S.D. Tex.)." Walker argues that since there was a judgment, payment is required. Walker's argument fails because Civil Action No. 03-CV-3497 is, of course, on appeal here.

Walker also makes a standing argument: specifically, it argues that only the ROC has standing to raise the issue of the ROC's sovereign immunity. In response, Murphy contends that under Texas garnishment law, it had a duty to raise any known defenses of the judgment debtor. This and Walker's standing argument are irrelevant to the FSIA. Walker cites *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1171 (D.C. Cir. 1994) ("It is the burden of the foreign sovereign in each case to establish its immunity by demonstrating that none of the exceptions is applicable."). *Princz* is irrelevant for our purposes. In *Princz*, the plaintiff sued the foreign sovereign directly; it was not a garnishment action involving an additional party. There was no need for the *Princz* court to make a distinction between the foreign sovereign and third parties.

Walker cites no authority and we were unable to find any authority for the proposition that it is the sovereign's *exclusive* right to raise the issue of sovereign immunity under the FSIA. In fact, the very language of the FSIA makes clear that the ROC's presence is irrelevant: "The property in the United States of a foreign state . . . shall not be immune from attachment . . . if) ) (1) the foreign state has waived its immunity . . . either explicitly or by implication." 28 U.S.C. § 1610(a). The FSIA sets parameters in which property may be attached: "the court may order the attachment or execution *only* as 'referred to in subsections (a) and (b).'" *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 250 (5th Cir. 2002) (emphasis added). Neither 28 U.S.C. § 1610(a) nor (b)

4

requires the presence of the foreign sovereign or gives the sovereign exclusive standing to raise the waiver element. Hence, we find no merit to Walker's standing argument and we need not address Murphy's response.

III

Finding the FSIA applicable, we turn to whether the ROC waived its sovereign immunity "either explicitly or by implication." 28 U.S.C. § 1610(a)(1). When a district court's decision involves mixed questions of law and fact, we review the factual findings for clear error, and legal conclusions and application of law to fact *de novo*. *Af-Cap v. Republic of Congo*, 383 F.3d 361, 368 (5th Cir. 2004) *reh'g granted*, 389 F.3d 503 (per curiam).

The FSIA codifies the restrictive theory of foreign sovereign immunity and is the only basis for obtaining *in personam* jurisdiction over a foreign sovereign. *In re B-727 Aircraft Serial No. 21010*, 272 F.3d 264, 270 (5th Cir. 2001). This statutory immunity is subject to several exceptions. The relevant provision states

> The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, *used for a commercial activity in the United States*, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if--
> (1) the foreign state has *waived its immunity* from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver. . . .

28 U.S.C. § 1610(a) (emphasis added). Therefore, a waiver of immunity only applies "against property that meets. . . two statutory criteria," namely, that the property in question be "in the United States" and "used for commercial activity in the United States." *Af-Cap*, 383 F.3d at 365 (citations

omitted).

A

Walker contends that the ROC waived its sovereign immunity explicitly in its contracts with Murphy. "An explicit waiver must be an intentional and knowing relinquishment of the legal right." *Good v. Aramco Services Co.*, 971 F.Supp. 254, 258 (S.D.Tex. 1997). In *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro*, 875 F.2d 1174 (5th Cir. 1989), we found that the national oil company of Brazil had waived its immunity in its financing agreement. The provision stated

> The Borrower. . . expressly and irrevocably waives any such right of immunity (including any immunity from the jurisdiction of any court or from any execution or attachment in aid of execution prior to judgment or otherwise ) or claim thereto which may now or hereafter exist, and agrees not to assert any such right or claim in any such action or proceeding, whether in the United States or otherwise.

*Id.* at 1177. Similarly, the ROC signed an agreement that waives sovereign immunity defenses. The Production Sharing Contract states, "[t]he Congo hereby irrevocably renounces to claim any immunity during any procedure relating to any arbitration decision handed down by an Arbitration Court. . . ." The plain language of "any immunity" indicates that sovereign immunity is also waived. Murphy does not argue, and this court has found no authority, suggesting the contrary. This "procedure" relates to the "arbitration decision" since Walker seeks to garnish funds owed to the ROC to collect on the ICC's judgment.

In addition, the ROC agreed to abide by the rules of the ICC which precludes the ROC from asserting a sovereign immunity defense. Rule 28(6) states, "[e]very Award shall be binding on the parties. By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse

6

insofar as such waiver can validly be made." I.C.C. RULE 28(6). Therefore, we hold that the ROC explicitly waived its sovereign immunity. Accordingly, we need not address a potential implicit waiver.

B

Having found waiver, we turn to the second requirement of the FSIA: whether the property is in the United States. 28 U.S.C. § 1610(a). Walker argues that the property was in the United States because (1) pledges to induce payments by an American company constitute commercial activity in the United States, and (2) the ROC contracted for legal services in the United States to defend this garnishment action. Murphy, on the other hand, claims that the pledged petroleum is repaid by oil in the ground in the ROC and, hence, is not in the United States. Further, Murphy claims that Walker's assertions lack evidentiary support.

In *Af-Cap v. the Republic of Congo*, 383 F.3d 361 (5th Cir. 2004), our most recent published decision involving the ROC, the ROC entered into a lending contract with Equator Bank Limited to provide funds necessary for the construction of a highway in the ROC. The ROC pledged as collateral "all of its assets and properties, wherever located." The ROC defaulted, and Connecticut Bank of Commerce ("Connecticut Bank"), an assignee of the contract, obtained a default judgment against the ROC in London, England. After registering the foreign judgment in the United States and obtaining an order of attachment, Connecticut Bank filed garnishment actions in Texas against various entities ("Garnishees") which owed the ROC taxes and royalties. *Af-Cap*, 383 F.3d at 364-65.

The *Af-Cap* court found that debtor obligations were, by nature, intangible and determining the situs required a context specific inquiry. *Id.* at 371. Approvingly, the court quoted an earlier Fifth

7

Circuit decision:

> The situs may be in one place for ad valorem tax purposes,. . .; it may be in another place for venue purposes, i.e., garnishment. . .; it may be in more than one place for tax purposes in certain circumstances. . .; it may be in still a different place when the need for establishing its true situs is to determine whether an overriding national concern, like the application of the Act of State Doctrine is involved.

*Id.* quoting *Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.*, 392 F.2d 706, 714-15 (5th Cir. 1968). Importantly, we state that "courts consistently hold that the situs of debtor obligation is the situs of the debtor." *Id*.

With a similar factual background to the case at hand, the court in *Af-Cap* concluded, "[w]e think a common sense appraisal of the requirements of justice and convenience in this particular context yields the conclusion that the situs of these royalty obligation is the United States ) ) the situs of the Garnishees." *Id.* (internal quotations omitted). In *Af-Cap,* the plaintiff was "not seeking to attach any of the Congo's physical property (like its oil) but instead it [sought] to attach the *obligations* to pay royalties owed by the garnishees." *Id.* at 371 n.12 (emphasis in original). Here, the property Walker seeks to attach is a surety bond in the United States. Murphy, the debtor, is also in the United States. Therefore, for the purposes of the FSIA, the surety bond is in the United States.

C

Under the FSIA, a third element must be met: property in the United States must also be "used for commercial activity" for implementation of a waiver of sovereign immunity. 28 U.S.C. § 1610(a). The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). Walker argues that the signing bonuses and other payments were used for commercial activity because the ROC pledged oil revenue

8

to pay for various administrative and transactional expenses related to the negotiation of the oil contracts. In addition, Walker argues that the ROC's promise to reimburse Murphy for its litigation expenses constitutes commercial activity. Neither argument is meritorious.

In the original *Af-Cap* appeal, this court held, "[w]hat matters under the statute is what the property is 'used for' . . . even if a foreign state's property has been generated by commercial activity in the United States, that property is not thereby subject to execution or attachment if it is not 'used for' a commercial activity within our borders." *Conn. Bank of Commerce*, 309 F.3d at 251. Thus, the fact that the property was generated by commercial activity, namely, oil exploration, is irrelevant. In vacating and remanding the case back to the trial court, the *Conn. Bank* court wrote, "[i]f it turns out that the royalties and tax obligations are not used for any commercial activity in the United States, the district court should dissolve the writs of garnishment and dismiss the action." *Id.* at 260-61. In *Conn. Bank*'s second appeal, the court found that "the Congo has used at least fifty percent of [the tax and royalty obligations] to repay commercial debt" and therefore concluded that the "tax and royalty obligations are used for commercial purposes of § 1610(a) of the FSIA." *Af-Cap*, 383 F.3d at 370-71. In reaching its conclusion, the court took a "holistic" approach, considering whether the commercial uses were bona fide exceptions to the noncommercial uses. *Id.* at 369.

In the present case, the district court found that no agreement was ever reached requiring the ROC to reimburse Murphy for its legal expenses. The magistrate judge did not clearly err in finding the factual testimony of the general manager of new ventures for Murphy credible when he testified that the agreements on reimbursement never got further than the negotiation stage. His testimony was bolstered by the lack of a signed finalized agreement requiring reimbursement. There is no legal authority suggesting that negotiations over property make the property "used for commercial activity"

9

under the FSIA.

Walker's next argument, that the property was used for commercial activity because the ROC was to reimburse Murphy for administrative and transactional costs, also fails. The magistrate judge found that "[t]he evidence fails to support the conclusion that [the] ROC spent or attempted to spend the payment obligations in any manner, commercial or otherwise." Even if there were evidence that the ROC paid Murphy for commercial services under this provision, Walker's argument still fails. Murphy was merely able to deduct certain expenses from the amount it owed the ROC; there was no commercial activity separate from the transaction that generated the property in the first place. In addition, contextually and holistically, minor reimbursements would not reach this standard. In *Af-Cap*, the court found that at least fifty percent of the proceeds had been used for commercial activity. *Af-Cap*, 383 F.3d at 370. There is no evidence that the reimbursements would be anywhere near fifty percent.

Beyond assertions of litigation and administrative reimbursements, there is no evidence in the record showing how the signing bonus and other payments were actually used, or even how other bonuses were used in the past. While these funds could indeed be used for other commercial purposes, such as debt service, *see id.* at 368, Walker does not make this assertion. Therefore, no other inquiry into the use of the monies is necessary and, for our purposes, we hold the funds were not "used for any commercial activity."

Walker further argues that the surety bond is commercial paper under the Texas Uniform Commercial Code (TEXAS BUS & COM. § 9-102), and is therefore, by definition, commercial. We find this argument meritless as it would completely undermine the intent of the FSIA. "One of the chief motifs of the FSIA is to limit as much as possible disrupting the 'public acts' or '*jure imperii*'

10

of sovereigns, while restricting their purely commercial activity." *Conn. Bank of Commerce*, 309 F.3d at 253. The *Conn. Bank* court provided the following hypothetical to explain the distinction:

> Consider an airplane owned by a foreign government and used solely to shuttle a foreign head-of-state back and forth for official visits. If the plane lands in the United States, it would not be subject to attachment or execution. The plane is not "used for" any commercial activity, in the U.S. or elsewhere. *It plainly would not matter how the foreign government bought the plane, raised the purchase price, or otherwise came into ownership.*

*Id.* at 253 (emphasis added). Under Walker's rationale, funds used to purchase a government plane or even an embassy could be subject to attachment depending on the method of payment. "Plainly Congress did not intend a result so inconsistent with recognized principles of international law." *Id.* at 253 n.4 quoting *City of Englewood v. Socialist People's Libyan Arab Jamahiriya*, 773 F.2d 31, 36-37 (3d Cir.1985). Thus, we find the Texas Uniform Commercial Code definition is inapplicable in interpreting the FSIA.

IV

Walker claims that the magistrate judge erred in ruling that there was not enough evidence to find that SNPC was the alter ego or "agent and instrumentality" of the ROC. If SNPC is the ROC's alter ego, it would have to undergo the same immunity analysis as the ROC. If SNPC is an "agent or instrumentality" of the ROC, then § 1610(b) of the FSIA determines whether its property is attachable. Reviewing the sufficiency of evidence is the application of law to facts and is reviewed *de novo*. *Af-Cap* 383 F.3d at 368.

Walker cannot attach the assets of the SNPC under the theory that the SNPC is an "agent or instrumentality" of the ROC. The FSIA defines "an agency or instrumentality" of a foreign state as any entity

(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ

11

of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).  The SNPC is a separate legal entity, established by Congolese law in 1998 and is not a citizen of the United States.  We need not determine whether the SNPC was "an organ of [the ROC] or political subdivision thereof, or a majority of whose shares is owned by" the ROC because Walker still would not be able to attach its assets.

Under 28 U.S.C. § 1610(b) of the FSIA,

any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if--(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or (2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a) (2), (3), (5), or (7), or 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based.

Walker does not explain how this section of the FSIA applies to SNPC.  Merely being an "agent or instrumentality" of a foreign state is insufficient to attach property under the FSIA.  Failing to argue all of the requirements under the FSIA, Walker's claims under § 1610(b) are deemed waived. *Thames*, 214 F.3d at 612 n.3.

Alternatively, Walker argues that it should be able to garnish SNPC's property under an alter ego theory.  Here again, we need not determine whether SNPC is an alter ego of the ROC because its property would still not be attachable.  Under the alter ego theory, SNPC's property could only

12

be attached if the ROC's property (currently in the form of the surety bond) could be attached. As explained *supra*, the surety bond cannot be attached because it failed to satisfy the criteria of the FSIA. Accordingly, there is no basis to attach SNPC's property.

V

The magistrate judge correctly found that the garnished funds were not "used for any commercial activity." Accordingly, the district court's decision to vacate the TRO, dissolve the writs of attachment and garnishment, and dismiss the action are AFFIRMED. Walker's motions to order the disbursement of the surety bond and for Murphy to show cause why it should not be held in contempt are DENIED.