Spencer NORRIS, Plaintiff,

v.

Anthony J. PRINCIPI, Secretary of Veterans Affairs,[1] Defendant.

No. C–3–94–507.

United States District Court,
S.D. Ohio,
Western Division.

Feb. 7, 2003.

1. The Defendant has been sued in his official capacity as the Secretary of the United States Department of Veterans Affairs. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Anthony J. Principi, the current Secretary of Veterans Affairs, is substituted as the Defendant in this litigation.

FINDINGS OF FACT; OPINION; CONCLUSIONS OF LAW; JUDGMENT TO BE ENTERED IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF; TERMINATION ENTRY

RICE, Chief Judge.

Plaintiff Spencer Norris has brought this litigation to recover damages he alleg-es he suffered as a result of the refusal to permit him to continue to enter into contracts as a retired annuitant investigator of equal employment opportunity ("EEO") complaints filed by employees of the United States Department of Veterans Affairs ("VA"). According to the Plaintiff, an African–American, he has been denied that opportunity, because of his race. Plaintiff also contends that he was required to submit rewritten reports concerning one of his investigations because of his race. In addition to seeking an award of compensatory damages, the Plaintiff requests a mandatory injunction, directing the Defendant to utilize his services as a retired annuitant investigator. The Plaintiff brings this action against the Secretary of Veterans Affairs in his official capacity. This case was tried with this Court sitting as trier of facts. Now, pursuant to Rule 52 of the Federal Rules of Civil Procedure, this Court sets forth its Findings of Fact and Conclusions of Law.

*I. Findings of Fact*

1. The VA operates more than 200 medical centers and other facilities throughout the United States.

2. When an employee of the VA files a charge of employment discrimination or asserts that he or she has been retaliated against in violation of employment discrimination statutes, an initial attempt to resolve the complaint is made at the local VA facility, through mediation. If those efforts do not resolve the matter, the complaint is investigated either by assigning the investigation to an ad hoc investigator (i.e., an employee of the VA who would conduct such an investigation in addition to performing his or her normal duties), or by assigning it to a retired annuitant investigator. Retired annuitant investigators are former employees of the VA, who are re-

tained as independent contractors to investigate charges of employment discrimination at VA facilities. The activities of the retired annuitant investigators are supervised by the VA's Office of Equal Opportunity ("OEO").

3. Retired annuitant investigators act as neutral fact finders for the VA when investigating charges of employment discrimination at VA facilities. After conducting their investigations, they must write reports which contain their factual findings and analysis. These reports frequently serve as the basis for senior personnel to take action on a particular complaint. That action could include adjusting the complainant's employment relationship or even disciplining those employees who violated the complainant's equal opportunity rights.

4. After officials at the VA's OEO determine that a report meets the requirements of the investigator's contract and the relevant manuals, the facility at which the complaint of discrimination was lodged is authorized to pay the investigator.

5. The Plaintiff is an African-American. From 1970, until he retired in 1989, Plaintiff was employed by the VA, rising to the position of Associate Chief of a VA facility located in St. Louis, Missouri.[2] Before he retired from the VA, the Plaintiff filed charges of discrimination, alleging that he had been discriminated against on the basis of his race.

6. After he had retired from the VA, Plaintiff applied to become a retired annuitant investigator of EEO complaints for that Government department. Although he did not receive a response to his initial inquiry, he was given the opportunity to become such a retired annuitant investigator in response to his second letter. To qualify as such an investigator, Plaintiff was required to complete a week-long training session. Plaintiff successfully completed his requisite training during July, 1990, in Chicago, Illinois.

7. In 1990, after having successfully completing his training, the Plaintiff began conducting investigations and writing reports as a retired annuitant investigator. From 1990, into July, 1993, the Plaintiff was assigned a total of 63 cases to investigate.[3] He prepared reports after having completed his investigations, which were submitted to officials at the VA's OEO. Plaintiff was paid for each of those investigations and reports. While being utilized as a retired annuitant investigator, Plaintiff acted as an independent contractor, rather than being an employee of the VA.

8. On July 22, 1993, the Plaintiff was given the assignment of investigating four complaints charging discrimination and retaliation, filed by Sam Henry Smith ("Smith"). Those complaints arose out of Smith's employment at the West Side Medical Center, a Chicago-area VA facility.[4] In particular, Smith asserted that he had been the victim of race and age discrimination, as well as being retaliated against, while he was employed at that facility and that he had been discharged because of his race, age, handicap and in retaliation for having filed a previous charge of discrimination.[5] During Sep-

2. The Plaintiff had also been employed by the VA between 1960 and 1963.

3. Those cases do not include the complaints filed by Sam Henry Smith, which are discussed below in the text.

4. Smith had been working at West Side Medical Center as an intern with the Environmental Management Service. He was admitted into that program as a result of the settlement of a charge of discrimination he had previously filed.

5. Smith was not discharged by the VA. Rather, he was involuntarily placed on disability retirement, because he was unable to perform the job to which he had been assigned and no other position which he could perform was

tember and early October, 1993, Plaintiff conducted an investigation at the West Side Medical Center. Plaintiff wrote two reports setting forth his analysis of the evidence and conclusions, which he submitted to the OEO in early October, 1993.[6] Each of those reports contained a conclusion in which Plaintiff found that Smith had been the victim of race, age and handicap discrimination, as well as having been retaliated against for having previously filed a charge of discrimination.[7]

9. The two reports which Plaintiff had submitted to the OEO were shown to John DeNardo ("DeNardo"), the Director of the West Side Medical Center, who sent a memorandum to the OEO requesting that a supplemental investigation be conducted. That memorandum also pointed out alleged shortcomings in the Plaintiff's two reports.

10. After being provided a copy of DeNardo's memorandum, Plaintiff responded with his own memorandum with which he attempted to refute DeNardo's criticisms of his two reports. On December 1, 1993, Plaintiff sent his memorandum to Michael Botello ("Botello"), an EEO specialist employed by the VA's OEO.

11. Despite having submitted two reports and a memorandum to the OEO, Plaintiff was not paid for his work in connection with the Smith complaints. As a consequence, he telephoned the OEO in order to ascertain when he might receive his payment. On November 16, 1993, he spoke with Nick Martinez ("Martinez"), an employee in the VA's OEO, and came away with the distinct impression that he would not be paid until he changed the conclusions in his reports that Smith had been the victim of discrimination and retaliation. That impression was reinforced by a letter under date of February 2, 1994, from Gerald Tognetti ("Tognetti"), which was signed by Riley Gordon ("Gordon").[8] The letter recounted that Plaintiff and Martinez had spoken on November 16th, and stated that it had been agreed that the conclusions in Plaintiff's reports, that Smith had been the victim of discrimination and retaliation, were not supported by the evidence that was discussed therein. As a consequence, Tognetti's February 2nd letter continued, it was suggested that the Plaintiff revise his conclusions. Tognetti concluded by writing that upon receipt of the revised conclusions, the Plaintiff's reports would be reviewed for compliance and accuracy before payment was authorized.

12. On March 1, 1994, Plaintiff responded by sending a letter to Gerald Hinch ("Hinch"), Deputy Assistant Secretary of the VA for Equal Opportunity. Therein, Plaintiff indicated that he believed that his integrity and professionalism were being questioned and that the failure to resolve the matter was affecting his ability to receive additional assign-

available. In one of his complaints, Smith asserted that he had been placed in his last job because of his race, age and handicap and in retaliation for having previously filed a charge of discrimination.

6. One of those reports addressed the three complaints in which Smith asserted that he had been discriminated against on the basis of his race and age and had been retaliated against for having previously filed a charge of discrimination, during the course of his employment at the West Side Medical Center. The other report focused upon Smith's fourth complaint, with which he alleged that he had been discriminated against on the basis of his race, age and handicap and had suffered retaliation as a result of being placed in a job he was physically unable to perform.

7. Plaintiff concluded that Smith had not been the victim of discrimination or retaliation with respect to one of his four charges of discrimination.

8. Tognetti and Gordon are respectively the Director and Assistant Director of the Discrimination Complaint Service of the OEO.

ments as a retired annuitant investigator. Plaintiff also questioned whether it was appropriate for the OEO to challenge the findings and recommendations of an investigator.

13. On March 23, 1994, Botello called Plaintiff to respond to his (Plaintiff's) letter to Hinch.[9] Botello began the conversation by explaining that the two of them were going to discuss the entire matter and that the Plaintiff would receive a letter which summarized their conversation. Botello also indicated that he understood that the Plaintiff had gotten angry over Martinez' telephone call the previous November and that he sympathized with Plaintiff. However, Botello stressed that both he and Martinez were attempting to communicate to Plaintiff that the analysis and the conclusions in his reports did not logically coincide. Botello explained that the analysis of the evidence contained in the Plaintiff's reports did not lead one to believe that Smith had been the victim of discrimination.[10] Botello emphasized that, although he was not necessarily disagreeing with the Plaintiff's conclusions in that regard, those conclusions were not supported by the evidence he had analyzed. Botello told Plaintiff that he had to rewrite his analysis and conclusions so that the latter would logically follow from the former. Botello also indicated that Plaintiff would need to go through retraining and that he would not be given any additional complaints to investigate until that was accomplished and the Smith matter was resolved (*i.e.,* he had submitted acceptable, rewritten reports). Botello asked the Plaintiff

when he would be able to submit the rewritten reports. Plaintiff did not want to provide a specific date, preferring to await the letter which Botello had promised.[11] Botello repeatedly told the Plaintiff that he should not delay the rewriting of his two reports until he received the letter. In addition, he told the Plaintiff that one of the rewritten reports would be due on April 12, 1994, while the other would be due on April 28th.

14. On March 30, 1994, Plaintiff wrote to Botello, noting that he had not received the letter which Botello had promised during their telephone conversation of March 23rd. Therein, Plaintiff did not indicate that he had begun rewriting his reports; rather, he said that he was "awaiting" receipt of that letter.

15. On April 19, 1994, Hinch sent a letter to the Plaintiff, reiterating that the conclusions in his two reports relating to the Smith matter were not consistent with his factual analysis and indicating that the Plaintiff's revised reports were due on June 24, 1994. Hinch enclosed with his letter a copy of a critique of the Plaintiff's reports about the Smith complaints.

16. On April 28, 1994, Plaintiff responded to Hinch's letter of April 19th, by submitting a charge alleging that Martinez, Botello, Hinch, Tognetti, Gordon and Judith Pitt–Hunter had discriminated against him on the basis of his race.

17. Plaintiff has not rewritten his reports on the investigation he conducted into the Smith complaints, despite having been directed to do so. In addition, he has

---

**9.** Unbeknownst to Botello, Plaintiff recorded his conversation with him. The parties have agreed that the transcription of that recording (Joint Exhibit and Defendant's Exhibit 3) accurately reflects the telephone conversation between the two.

**10.** Before he called Plaintiff, Botello had conferred with Martinez and Judith Pitt–Hunter,

the head of his team at the OEO. All three had read the Plaintiff's reports and agreed that his conclusions did not logically flow from his analysis of the evidence.

**11.** Plaintiff also explained that he was going out of state later that day, making it difficult to commit to completing his assigned task by a particular date.

not been paid for his investigation of the Smith complaints, nor has he been assigned other complaints to investigate since the dispute concerning his reports arose.

18. Plaintiff was not discriminated against on the basis of his race by being directed to submit rewritten reports concerning the Smith matter. Rather, he was directed to do so, because the conclusions contained in his initial reports, that Smith had been discriminated and retaliated against, were not supported by the evidence discussed therein. Plaintiff's race played no role in the decision to order him to submit rewritten reports.

19. The OEO has a policy of not awarding additional contracts to any investigator who failed to file a report in a timely fashion or has failed to file an acceptable report.

20. The Defendant has declined to assign any additional investigations to the Plaintiff, because he refused the directive to submit rewritten reports concerning the Smith matter. The Plaintiff's race played no role in the decision to decline to award him additional investigative contracts.

## II. Opinion

■ On the first day of the trial of this lawsuit, immediately before the parties began to present evidence, counsel for the Defendant asked Plaintiff's counsel whether his client had been sued in his individual or official capacity. *See* Transcript of Proceedings of April 7, 1997 (Doc. # 59) at 5. Counsel for the Plaintiff informed the Court that the Defendant had been sued in his official capacity alone. *Id.* That caused Defendant's counsel to question whether the Government had waived its sovereign immunity and, thus, whether this Court could exercise jurisdiction over this litigation. *Id.* The Court decided that the presentation of evidence would proceed as scheduled and that, in its Findings of Fact

and Conclusions of Law, the Court would initially resolve the issue of its jurisdiction, turning to the merits of Plaintiff's claims only if it concluded that it could exercise jurisdiction over this matter. *Id.* at 7. Consequently, the Court turns to the question of whether the doctrine of sovereign immunity bars it from exercising subject matter jurisdiction herein.

■ Since the Plaintiff has sued the Defendant in his official capacity as Secretary of the Department of Veterans Affairs, this litigation is, in effect, a lawsuit against the United States. *See e.g., Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2nd Cir.1994); *Ecclesiastical Order of the Ism of Am, Inc. v. Chasin,* 845 F.2d 113, 115–16 (6th Cir.1988). *See also, Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). In *Gao v. Jenifer,* 185 F.3d 548 (6th Cir.1999), the Sixth Circuit restated the fundamental principles which are applicable to claims of the United States that a lawsuit is prohibited by the doctrine of sovereign immunity:

" 'Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.' " *Department of the Army v. Blue Fox, Inc.,* 525 U.S. 255, 119 S.Ct. 687, 690, (1999) (quoting *FDIC v. Meyer,* 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)). "[A] waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign." *Ibid.* (citing *Lane v. Pena,* 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) and *Library of Congress v. Shaw,* 478 U.S. 310, 318, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986)). "Such a waiver must also be 'unequivocally expressed' in the statutory text." *Ibid.* (citing *Lane,* 518 U.S. at 192, 116 S.Ct. 2092). Sovereign immunity is jurisdictional in nature. *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

*Id.* at 554. *See also, United States v. Tennessee Pollution Control Bd.,* 185 F.3d 529, 531 (6th Cir.1999). The Plaintiff has set forth claims under 42 U.S.C. § 1981 and the mandamus statute, 28 U.S.C. § 1361.[12] The Plaintiff argues that those statutes constitute waivers of sovereign immunity and, that, therefore, this Court can exercise jurisdiction herein.

■ With respect to Plaintiff's claim under § 1981, the language of that statute would belie the argument that it constitutes a waiver of the sovereign immunity of the United States. Section 1981(c) expressly provides that the "rights protected by this section are protected against non-governmental discrimination and impairment under color of State law." Decidedly missing from that statutory provision is any mention that the rights created by § 1981 are protected from discrimination by those acting under color of *federal* law. Therefore, a waiver of the sovereign immunity of the United States is not "unequivocally expressed" in § 1981. Moreover, every court which has addressed the question has concluded that § 1981 does not constitute a waiver of the sovereign immunity for suits against the United States or against federal employees acting within their official capacities. *See e.g., Affiliated Prof'l Home Health Care Agency v. Shalala,* 164 F.3d 282, 285 (5th Cir. 1999) ("This Court has long recognized that suits against the United States brought under the civil rights statutes [42 U.S.C. §§ 1981, 1983, 1985, 1986, and 1988] are barred by sovereign immunity."); *United States v. Timmons,* 672 F.2d 1373,

1380 (11th Cir.1982); *Bernard v. Calejo,* 17 F.Supp.2d 1311, 1314 (S.D.Fla.1998). *Cf. Selden Apartments v. United States Dept. of Housing & Urban Development,* 785 F.2d 152, 156–57 (6th Cir.1986) ("sue and be sued" clause in § 1 of the National Housing Act, 12 U.S.C. § 1702, did not constitute a waiver of sovereign immunity, permitting a suit against the Department of Housing & Urban Development under § 1981). Accordingly, this Court concludes that the United States has not waived its sovereign immunity for lawsuits under § 1981.

■ With respect to the Plaintiff's claim under § 1361, that statute provides that the District Courts "shall have original jurisdiction of any action in the nature of mandamus to compel an officer of employee of the United States or any agency thereof to perform a duty owed to the plaintiff." In *Your Home Visiting Nurse Services, Inc. v. Secretary of Health and Human Services,* 132 F.3d 1135 (6th Cir. 1997), *affirmed,* 525 U.S. 449, 119 S.Ct. 930, 142 L.Ed.2d 919 (1999), the Sixth Circuit explained:

> Mandamus jurisdiction is available only if (1) the plaintiff has exhausted all available administrative appeals and (2) the defendant owes the plaintiff a "clear nondiscretionary duty" that it has failed to perform. *Heckler v. Ringer,* 466 U.S. 602, 616, 104 S.Ct. 2013, 80 L.Ed.2d 622.

*Id.* at 1141. *Accord, Buchanan v. Apfel,* 249 F.3d 485 (6th Cir.2001). Herein, the Defendant does not argue that the Plaintiff possessed administrative remedies which he has failed to exhaust.[13] Rather, the

---

**12.** Plaintiff also cites 28 U.S.C. § 1328 (*see* Doc. # 65 at 7), which, since it does not exist, cannot constitute a waiver of sovereign immunity.

**13.** A federal employee has the ability to obtain redress for employment discrimination through Title VII, 42 U.S.C. § 2000e, *et seq.,* which contains administrative remedies that must be exhausted. Indeed, Title VII pro-

vides the exclusive remedy for employment discrimination claims advanced by federal employees. *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). However, since the Plaintiff was acting as an independent contractor for the VA, rather than being an employee of the United States, Title VII does not apply to his claim; consequently, the availability of administrative remedies under that

Defendant contends that the Plaintiff has not established that it violated a nondiscretionary duty, by refusing to continue to utilize his services as a retired annuitant investigator of EEO complaints. The Plaintiff counters that assertion, by arguing that the Defendant's actions were ultra vires and that, therefore, the Defendant did not engage in the type of discretionary activity which would prevent this Court from entertaining his request for mandamus. In support of his position, Plaintiff relies upon *Washington Legal Foundation v. United States Sentencing Commission,* 89 F.3d 897 (D.C.Cir.1996). Therein, the plaintiff had brought suit, alleging that it had a common law right to inspect the internal documents and memoranda of an advisory group on environmental sanctions established by the United States Sentencing Commission, because those documents and memoranda were public records. Before the District Court, the defendant argued, *inter alia,* that sovereign immunity prevented the exercise of subject matter jurisdiction over that litigation. The District Court rejected that argument, noting that the plaintiff claimed that subject matter existed by virtue of the mandamus statute, 28 U.S.C. § 1361, and that sovereign immunity did not bar suits under that statute to compel a public official to perform a legal duty. The District Court reasoned further that whether the defendant owed such a duty depended upon whether the documents and memoranda constituted public records and, that, therefore, resolution of the question of whether subject matter jurisdiction existed was interwoven with the merits of the plaintiff's claim. Subsequently, the District Court concluded that the documents and memoranda were not public records and, thus, declined to order the defendant to permit the plaintiff to inspect them. On plaintiff's appeal, the District of Columbia Court of

Appeals initially addressed the issue of whether the Government had waived its sovereign immunity and, thus, whether subject matter jurisdiction existed. The appellate court noted that although the mandamus statute does not constitute a waiver of sovereign immunity, no separate waiver of sovereign immunity is needed, if the plaintiff is seeking a writ of mandamus to force a public official to perform a duty imposed upon him in his official capacity. *Id.* at 901. The court of appeals indicated that its analysis of the mandamus statute was based upon *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) and *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963). In *Larson,* the Supreme Court explained:

> There may be, of course, suits for specific relief against officers of the sovereign which are not suits against the sovereign. If the officer purports to act as an individual and not as an official, a suit directed against that [person] is not a suit against the sovereign. If the War Assets Administrator had completed a sale of his personal home, he presumably could be enjoined from later conveying it to a third person. On a similar theory, where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden. His actions are ultra vires his authority and therefore may be made the object of specific relief. It is important to note that in such cases the relief can be granted, without impleading the sovereign, only because of the officer's lack of delegated power. A claim of error in the exercise of that power is therefore not sufficient. And,

statute does not impact upon Plaintiff's re- quest for relief in the form of mandamus.

since the jurisdiction of the court to hear the case may depend, as we have recently recognized, upon the decision which it ultimately reaches on the merits, it is necessary that the plaintiff set out in his complaint the statutory limitation on which he relies.

337 U.S. at 689–90, 69 S.Ct. 1457 (footnote omitted). In *Washington Legal Foundation*, the District of Columbia Circuit held that the question of whether the *Larson–Dugan* exception was applicable merged with the merits. 89 F.3d at 901–02. In other words, if the Government had violated its duty to disclose the documents, then sovereign immunity would not prevent a federal court from utilizing the mandamus statute to order the disclosure of those documents. *See also, Swan v. Clinton*, 100 F.3d 973, 981 (D.C.Cir.1996) (holding that *Larson–Dugan* exception would be applicable to plaintiff's request for mandamus to compel his reinstatement to position as a member of the Board of the National Credit Union Administration ("NCUA"), if his removal from that Board violated the NCUA statutes and that, therefore, the issue of the waiver of sovereign immunity merged with the merits). This Court agrees with the analysis of the District of Columbia Court of Appeals in *Washington Legal Foundation*. It cannot be doubted that the United States and its departments and agencies are under a duty to refrain from discriminating on the basis of race. *See e.g., Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Accordingly, the Court concludes that the question of whether it can exercise jurisdiction over Plaintiff's request for mandamus is merged with the merits of the Plaintiff's claim that he was the victim of race discrimination. In other words, if the Plaintiff was required to submit rewritten reports on the Smith investigation and/or has been denied additional investigative contracts because of his race, the Defendant's employees engaging in that activity will have been acting ultra vires, making it permissible for the Court to grant the requested writ of mandamus, directing the Defendant to resume using the Plaintiff's services as an investigator.[14]

■ The Plaintiff claims that the Defendant has violated the equal protection component of the Due Process Clause of the Fifth Amendment, by ordering him to submit rewritten reports on the Smith investigation and by refusing to assign him additional contracts to investigate complaints of discrimination, all because of his race.[15] The parties have analyzed this issue in accordance with the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Depart-*

---

**14.** It should be noted, however, that the Plaintiff would not be entitled to recover damages, since he is seeking to recover an unliquidated sum of damages. In *Maczko v. Joyce*, 814 F.2d 308 (6th Cir.), *cert. denied*, 484 U.S. 828, 108 S.Ct. 98, 98 L.Ed.2d 58 (1987), the Sixth Circuit held that a party cannot utilize the mandamus statute to recover unliquidated damages from the United States.

**15.** The Plaintiff also contends that he has been denied additional contracts to investigate complaints of discrimination, in order to retaliate against him for having filed a complaint of discrimination while he was employed by the VA. Simply stated, the Plaintiff failed to introduce sufficient evidence to support that contention. In order to establish a claim of retaliation, a plaintiff must establish, *inter alia*, the existence of a causal connection between the protected activity and the adverse employment action. See *e.g., Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831 (6th Cir. 1999); *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir.1999). The Plaintiff did not submit evidence which would cause this Court to find that there was a causal connection between the Plaintiff's complaint of discrimination and the decision to deny him additional contracts.

*ment of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[16] In *Hollins v. Atlantic Company, Inc.,* 188 F.3d 652 (6th Cir.1999), the Sixth Circuit reviewed that analytical framework:

> In a Title VII case, in the absence of direct evidence, the burden-shifting approach for inferential proof of discrimination set forth in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies. *Burns v. City of Columbus Dep't of Pub. Safety,* 91 F.3d 836, 843 (6th Cir.1996). . . . . .
>
> We have described the familiar *McDonnell Douglas* analysis as follows: (1) the plaintiff must establish a *prima facie* case of racial discrimination; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was in fact pretextual.
>
> *Harrison v. Metropolitan Gov't of Nashville and Davidson County,* 80 F.3d 1107, 1115 (6th Cir.1996).

*Id.* at 658. Herein, an application of the *McDonnell Douglas* burden-shifting approach is unwarranted, because this case has been tried. The principle that the *McDonnell Douglas* analytical approach is inapplicable after a discrimination case has been tried was restated by the Sixth Circuit in *Kovacevich v. Kent State University,* 224 F.3d 806 (6th Cir.2000). Therein, the District Court granted defendant's renewed motion for judgment as a matter of law, made after the jury had rendered its verdict, since the plaintiff had failed to establish a *prima facie* case of discrimination. Upon appeal, the Sixth Circuit concluded that the District Court had erred by considering whether the plaintiff had established a *prima facie* claim of discrimination after the matter had been tried. *Id.* at 825. The Sixth Circuit wrote:

> [T]his Court's decision in *EEOC v. Avery Dennison Corporation,* 104 F.3d 858, 862 (6th Cir.1997), clearly establishes that, after a trial on the merits, a reviewing court should not focus on the elements of the prima facie case but should assess the ultimate question of discrimination. Relying heavily on *United States Postal Service Board v. Aikens,* 460 U.S. 711, 717, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the *Avery Dennison* Court stated:
>
>> [A] prima facie case is defined as "sufficient evidence in the type of case to get plaintiff past a motion for directed verdict in a jury case or motion to dismiss in a nonjury case; it is the evidence necessary to require defendant to proceed with his case." Black's Law Dictionary 1190 (6th ed.1990). The finding that plaintiff has proven a prima facie case forces the defendant to proceed with its case. It necessarily follows then, that the defendant is not entitled to judgment as a matter of law or summary judgment if a plaintiff has proven its prima facie case. Following a trial on the merits, the district court, therefore, cannot return to a consideration of whether plaintiff has proven its prima facie case. This is a preliminary matter which cannot be revisited at a later time.

---

**16.** *McDonnell Douglas* involved the a claim of discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The framework which is used to analyze claims under Title VII is applied to discrimination claims predicated on the theory that the plaintiff has been denied equal protection of the laws. *See e.g., Buntin v. Breathitt County Bd. of Ed.,* 134 F.3d 796, 800 (6th Cir.1998); *Kitchen v. Chippewa Valley Schools,* 825 F.2d 1004, 1011–12 (6th Cir. 1987).

104 F.3d at 861.

*Id.* at 821. In accordance with *Kovacevich,* this Court dispenses with the *McDonnell Douglas* burden-shifting analytical framework and turns to the question of whether Plaintiff proved by the preponderance or greater weight of the evidence that the Defendant required him to submit rewritten reports on the Smith matter and/or refused to assign him further investigations because of his race.[17]

As indicated, the Plaintiff contends that the Defendant discriminated against him on the basis of his race, by ordering him to submit rewritten reports concerning the Smith investigation and by refusing to assign him additional investigative contracts. Above, the Court has found that the Defendant ordered the Plaintiff to submit rewritten reports for the Smith investiga-

tion, because the conclusions in his initial submissions, that Smith had been the victim of discrimination and retaliation, were not supported by the evidence which was discussed in those reports and, further, that Plaintiff's race did not play a role in the decision to require him to submit the rewritten reports. The Court has also found that the Defendant declined to award additional investigative contracts to the Plaintiff, because he refused the directive to submit those rewritten reports and that his race played no role in that decision. The evidence presented during the trial fully supports these findings. An examination of the initial two reports which Plaintiff submitted for the Smith investigation confirms that the conclusions that Smith had been discriminated and retaliated against were not supported by the evidence which the Plaintiff had discussed in his reports.[18] For instance, in

---

**17.** Even if the Court were to apply the *McDonnell Douglas* framework, it would nevertheless find that the Plaintiff was not discriminated against because of his race. In *Policastro v. Northwest Airlines, Inc.,* 297 F.3d 535 (6th Cir.2002), the Sixth Circuit reiterated:

> To establish a prima facie case, a plaintiff must show (1) "that [he] is a member of a protected group," (2) "that [he] was subject to an adverse employment decision," (3) "that [he] was qualified for the position," and (4) "that [he] was replaced by a person outside of the protected class." *Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 349 (6th Cir.1997).

*Id.* at 538–39. While ample evidence was presented at trial, permitting this Court to find that the Plaintiff established the first three elements of a *prima facie* case, there was no evidence that the Plaintiff was replaced by someone outside the protected class. However, the Sixth Circuit has held that the fourth element of a *prima facie* case can be established by showing the plaintiff was treated less favorably than a similarly situated individual outside the protected class. *See e.g., Clayton v. Meijer, Inc.,* 281 F.3d 605, 610 (6th Cir.2002). Simply stated, the Plaintiff did not prove that a similarly situated white, retired annuitant investigator was not

required to rewrite a report in which conclusions that the complainant had been the victim of discrimination or retaliation were not supported by the evidence discussed in the report and/or was given additional assignments after disregarding a directive to rewrite an investigative report. However, even assuming for sake of argument that Plaintiff had proved the elements of a *prima facie* case of discrimination, the Defendant has met its burden of articulating a nondiscriminatory reason for ordering Plaintiff to submit rewritten reports, to wit: the conclusions in his initial reports, that Smith had been discriminated and retaliated against, were not supported by the evidence discussed therein. In addition, the Defendant met its burden of articulating a nondiscriminatory reason for refusing to assign further investigations to the Plaintiff, to wit: he disregarded the directive to rewrite his reports concerning the Smith investigation. Such production has shifted the burden of persuasion back to the Plaintiff, who failed to prove that the Defendant's stated reasons for ordering him to submit rewritten reports and refusing to assign him further investigations are pretexts for discrimination.

**18.** The two reports are Plaintiff's Exhibits 5 and 21.

one of those reports, the Plaintiff concluded that Smith was discriminated against on the basis of his race, age and handicap and retaliated against for having previously filed a charge of discrimination, as a result of being assigned to a position which he allegedly could not perform because a work-related back injury. Plaintiff failed to discuss evidence which would have supported those conclusions. Indeed, the evidence discussed in that report leads one to the conclusion that Smith was not so discriminated or retaliated against. The Plaintiff appears to have based his conclusions solely upon Smith's subjective impression that he had been the victim of such discrimination and retaliation.

With respect to the Plaintiff's claim that he is the victim of race discrimination as a result of having been denied further contracts to conduct EEO investigations, Botello clearly told the Plaintiff, during their telephone conversation of March 23, 1994, that his initial reports about the Smith investigation were not acceptable, because the conclusions set forth in those reports were not supported by the evidence discussed therein. Botello also directed the Plaintiff to submit rewritten reports. In addition, Botello informed Plaintiff that he would not be given additional assignments until the Smith matter was resolved. Hinch reinforced Botello's statements in his April 19th letter to the Plaintiff. Rather than comply and submit rewritten reports, Plaintiff chose to ignore the instructions, which has resulted in the denial of further contracts to conduct EEO investigations. Thus, the Plaintiff had been told to submit rewritten reports and had been told that he would not be given any assignments until that had been accomplished. The fact that he chose to ignore the directive and suffered the threatened consequences is not evidence that he was discriminated against on the basis of his race. Quite simply, Plaintiff's race played no part in the decisions to require that he submit rewritten reports on the Smith investigation and to deny him further contracts as a retired annuitant investigator when he refused to submit such rewritten reports.

Nevertheless, the Plaintiff argues that the evidence established that he was discriminated against on the basis of his race, because the evidence showed that the Defendant treated similarly situated white investigators differently. In support of this argument, the Plaintiff relies upon the testimony of Liston Jackson ("Jackson"), who was formerly employed by the VA as an equal opportunity investigator. In particular, Jackson testified that Vernon Clayton ("Clayton"), a white investigator employed by the VA, was given the assignment of investigating a particular charge of discrimination made by an employee of the Board of Veterans Appeals. After Clayton had submitted his report, the Director of the Board wrote to the OEO, requesting that a supplemental report be prepared. According to Jackson, Clayton was not required to prepare that supplemental report, rather Tognetti assigned that task to another investigator. Unlike the Plaintiff, however, there is no indication that Clayton submitted a report in which his conclusion that the complainant had been discriminated against was not supported by the evidence he had analyzed. Nor is there evidence that Clayton, like the Plaintiff, refused to submit a rewritten report despite being ordered to do so. Indeed, another investigator was directed to submit a rewritten report. As an initial matter, the Court agrees with the Plaintiff's implicit premise that treating similarly situated white investigators more favorably would be evidence that he was the victim of race discrimination. However, it bears emphasis that he and the white investigators must be similarly situated in all relevant respects. *See Clayton v. Meijer, Inc.,* 281 F.3d 605, 611 (6th Cir.2002) (noting

that "the plaintiff is required to demonstrate that he or she is similarly situated to the non-protected employee in all relevant respects") (internal quotation marks and citation omitted). The evidence relating to the supplemental report which was requested after Clayton conducted an investigation is not detailed. For instance, Jackson did not testify that Clayton's report, like the Plaintiff's reports concerning Smith, contained conclusions of discrimination and retaliation which were not supported by the evidence discussed therein. Moreover, the Plaintiff has been denied further contracts to investigate complaints of discrimination, because he ignored repeated directives to rewrite reports in which the conclusions did not logically flow from the evidence discussed in those reports. There was no evidence that Clayton ignored such a directive and was thereafter given contracts to conduct further investigations. Accordingly, the Court concludes that the Plaintiff failed to prove that he and Clayton were similarly situated in all relevant respects.[19] As a consequence, the allegedly different treatment of the Plaintiff and Clayton does not cause the Court to find that the Plaintiff was the victim of race discrimination.

In his Revised Findings of Fact and Conclusions of Law, the Plaintiff contends that he was confused by the instructions which he received from Botello, Martinez and Hinch and that he concluded that they wanted him to change his conclusions of discrimination with respect to the Smith investigation. *See* Doc. # 65 at 3. In his Post–Trial Memorandum, the Plaintiff asserts that the confusing communications he received from the individuals at the VA's OEO caused him to believe that he was being required to change his conclusion that Smith had been discriminated and retaliated against. *See* Doc. # 66 at 7. Plaintiff contends that he did not revise his reports as a result of that confusion and his conclusion that stemmed therefrom. *Id.* The Court accepts for present purposes that the Plaintiff was confused by the instructions he had received and assumes, arguendo, that such confusion caused him to refuse to rewrite his investigative reports.[20] However, the issue presented in this litigation is whether the Defendant has discriminated against the Plaintiff because of his race, not whether the Plaintiff was confused about the directive that he rewrite his reports concerning the Smith investigation. Even if the Court were to assume that the Defendant bears responsibility for the Plaintiff's confusion, such an assumption would not cause the Court to find that the Defendant discriminated against Plaintiff because of Plaintiff's race. One could argue that, from an employee relations point of view, the Plaintiff would have been treated improperly if he had become confused about what was expected of him, as a result of

---

**19.** There was one similarity between the Smith case and the investigation in which Clayton had been involved. In both instances, the Director of the institution, in which the complaining party worked, requested that supplemental reports be prepared. That similarity, alone, does not cause this Court to conclude that Clayton and the Defendant are similarly situated. The Plaintiff was not directed to prepare supplemental reports, because DeNardo, the Director of the of the West Side Medical Center, had requested such reports. Rather, Plaintiff was given that assignment, because the conclusions in his initial reports, that Smith had been discriminated and retaliated against, were not supported by the evidence Plaintiff had discussed in those reports.

**20.** The Court cannot accept Plaintiff's assertion that he was merely being told to change his conclusions that Smith had been discriminated and retaliated against to contrary conclusions. Rather, the Plaintiff was told to submit reports in which the conclusions logically flowed from the evidence which was discussed.

the actions of the Defendant's employees, and if that confusion had caused him to refuse to submit rewritten reports, and if he had been discharged as a result. However, it is axiomatic that a court resolving a discrimination lawsuit does not sit as a super personnel board of review, to second guess an employer's business decisions. *Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1007 (7th Cir.2002); *Greer v. St. Louis Regional Med. Center,* 258 F.3d 843, 847 (8th Cir.2001); *Denney v. City of Albany,* 247 F.3d 1172, 1188 (11th Cir. 2001); *Feliciano de la Cruz v. El Conquistador Resort and Country Club,* 218 F.3d 1, 8 (1st Cir.2000); *Barbour v. Browner,* 181 F.3d 1342, 1346 (D.C.Cir.1998). *See also, Hartsel v. Keys,* 87 F.3d 795, 801 (6th Cir.1996) ("The law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or fail to promote for impermissible, discriminatory reasons."); *Batts v. NLT Corp.,* 844 F.2d 331, 337 (6th Cir.1988) ("The ultimate question to be resolved is whether the employer treated some people less favorably than others because of their race, not whether the employer treated an employee less favorably than someone's general standard of equitable treatment."). Thus, the fact that the Plaintiff may have been confused and the Defendant may have been partially responsible for that confusion does not cause this Court to find that the Plaintiff was discriminated against because of his race.

Based upon the foregoing, the Court has found that the Plaintiff was not discriminated against on the basis of his race by being told to submit rewritten reports on the Smith matter or by being denied further investigative contracts when he ignored that directive.

### III. Conclusions of Law

1. Since the Plaintiff has sued the Defendant in his official capacity, the Plaintiff's claims are against the United States.

2. The United States has not waived its sovereign immunity for claims under 42 U.S.C. § 1981; therefore, this Court is without subject matter jurisdiction over the Plaintiff's claim under that statute.

3. In accordance with the *Larson–Dugan* exception, the issue of whether this Court can exercise subject matter jurisdiction over the Plaintiff's request for mandamus under 28 U.S.C. § 1361 is merged with the merits of Plaintiff's claim that he is the victim of racial discrimination. *Washington Legal Foundation, supra.*

4. The Plaintiff has failed to prove, by the preponderance of the evidence, that the Defendant discriminated against him on the basis of his race, by ordering him to submit rewritten reports on the Smith investigation or by denying him further investigative contracts when he refused that order.

Based upon the foregoing, the Court directs that judgment be entered in favor of the Defendant and against the Plaintiff.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.